# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

HELEN NETT,

    Plaintiff,

v.

Case No. 04-C-534

MILWAUKEE COUNTY and
DOROTHY DEAN,

    Defendants.

## DECISION AND ORDER

### NATURE OF CASE

The plaintiff, Helen Nett, commenced this action against the defendants, Milwaukee County and Dorothy Dean, the plaintiff's employer and supervisor respectively. In her complaint, the plaintiff makes claims under the Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. § 2617. The plaintiff alleges that the defendants violated 29 C.F.R. § 825.307, discriminated against her for filing a grievance with her union and retaliated and harassed her for taking medical leave.

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the matter arises under federal statutes. Venue is proper under 28 U.S.C. § 1391. The case was assigned according to the random assignment of civil cases pursuant to 28 U.S.C. § 636(b)(1)(B) and General Local Rule 72.1 (E.D. Wis.). The parties have consented to United States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General Local Rule 73.1 (E.D. Wis.).

The defendants filed a motion for summary judgment. The motion is fully briefed and will be addressed herein.

## Standard for Summary Judgment

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); McNeal v. Macht, 763 F.Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The burden of showing the needlessness of a trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant. In determining whether a genuine issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. Anderson, 477 U.S. at 267; see also, Celotex Corp., 477 U.S. at 324 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves . . ."); Fed. R. Civ. P. 56(e). "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case and

- 2 -

on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322

(emphasis added).

Evidence relied upon in a motion for summary judgment must be of a kind that would

be admissible at trial. See Waldridge v. American Hoechst Corp., 24 F.3d 918, 921 n.2 (7th

Cir. 1994) (citing Gustovich v. AT & T Communications, Inc., 972 F. 2d 845, 849 [7th Cir.

1992]; Fed. R. Civ. P. 56 [e]). Federal Rules of Civil Procedure 56(e) expressly provides in

pertinent part:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.

See also, Halloway v. Milwaukee County, et al, 180 F.3d 820, 827 n.9 (7th Cir. 1999)

(upholding district court's exclusion on summary judgment of portions of affidavit as hearsay).

Proposed findings of fact which are based on hearsay to which a party objected are

not included in the relevant facts set forth in this decision. See Eisenstadt v. Centel Corp., 113

F.3d 738, 742 (7th Cir. 1997 ("[H]earsay is inadmissible in summary judgment proceedings

to the same extent that it is inadmissible in a trial.") Similarly, proposed findings of fact which

are conclusory and not based on personal knowledge do not create a triable issue of fact and

have not been included. Hall v. Bodine Elec. Co., 276 F.3d 345, 354 (7th Cir. 2002) (citing

Patterson v. Chicago Ass'n for Retarded Citizens, 150 F.3d 719, 724 [7th Cir. 1998]).

Allegations made in a complaint also do not meet the requirement of admissible evidence and

no not create a triable issue of fact. Therefore, any proposed findings based on allegation

in the pleadings have not been included in the relevant facts.

- 3 -

There is no abuse of discretion for the court to strike responses that simply deny an allegation and provide no citation to the record. Ammons v. Aramark Uniform Services, Inc., 368 F.3d 809, 817-18 (7th Cir. 2004). Moreover, a party may not create an issue of fact with an affidavit containing conclusions that contradict depositions or other sworn testimony. F.T.C. v. Bay Area Business Council, Inc., 423 F.3d 627 (7th Cir. 2005); Ineichen v. Ameritech, 410 F.3d 956, 963 (7th Cir. 2005).

## **RELEVANT UNDISPUTED FACTS**[1]

On January 18, 1988, the plaintiff, Helen Nett, began working for Milwaukee County. Initially she worked at the County Medical Complex, but in January 1991, she began working in the County Treasurer's Office as a Clerk Typist IV. Subsequently, she became an Administrative Assistant – Tax Enforcement for the Milwaukee County Treasurer's Office. She was a member of the Milwaukee District Council, AFSCME union at all relevant times. An applicable collective bargaining agreement and work rules and county policies governed her terms and conditions of employment.

In February 2000, defendant Dorothy K. Dean became Milwaukee County Treasurer, which is an elected position. Richard Williams was the second in command in the Treasurer's Office as the accounting coordinator until his retirement in November 2003. In that capacity, Mr. Richards was the immediate supervisor of the plaintiff and the office staff.

---

[1]As a general matter, unless accompanied by citation, the relevant facts are taken from the parties' proposed findings of fact which are not disputed. Citations to sources of quoted excerpts have been included even when those excerpts are undisputed.

- 4 -

Although defendant Dean was not the plaintiff's direct supervisor, she had supervisory authority over her. Among other things, defendant Dean decided whether to issue disciplinary warnings to the plaintiff and whether the plaintiff was entitled to medical leave.

The plaintiff and defendant Dean worked together from February 2000, when Dean assumed office, until February 24, 2004, when the plaintiff's employment with the County ended. The plaintiff's duties included collection of delinquent taxes, tracking the County tax levy, personal property chargeback recording, pet license payments, preparation of foreclosures and related follow-up, processing the payroll for the department, procurement, a portion of lottery credits processing, and tax delinquency procedures relative to bankruptcy. She was the only person in the Treasurer's Office who knew how to perform her job. The plaintiff's job was a very important one.

## DEFENDANT DEAN AND THE PLAINTIFF'S WORK HISTORY

The plaintiff found defendant Dean difficult to work with because nothing was consistent. During the time that the plaintiff and defendant Dean worked together, the plaintiff believed that defendant Dean was never consistent and that rules and procedures would change from day to day, thereby making it difficult for the plaintiff to work with defendant Dean. Other employees in the Treasurer's office had the same problems with defendant Dean. The plaintiff characterized working with defendant Dean as "stressful." (Deposition of Helen Nett [Nett Dep.] at 22).

Defendant Dean's conduct made it stressful to work in the Treasurer's Office and the plaintiff felt that defendant Dean's conduct created a hostile work environment and an underlying hostility in the office. The plaintiff believed that defendant Dean got along better with some employees than others. The plaintiff believed that in 2003, she was the most

- 5 -

pages 6-11

# NOT AVAILABLE

# PRIVACY
# REQUIREMENT

# UNDER

# E-GOVERNMENT ACT

On June 30, 2003, the plaintiff received another inter-office communication with the subject line, "Response to request for FMLA leave." Defendant Dean authored this communication. She wrote in pertinent part:

> You ARE eligible for leave under federal and/or state FMLA laws for the following dates: due to your chronic, serious health condition.
>
> . . .
>
> You ARE NOT required to furnish a FMLA MEDICAL CERTIFICATION BY HEALTH CARE PROVIDER … Certification form already provided.
>
> . . .
>
> You ARE NOT required to furnish a statement from your health care provider indicating that you are able to resume working with/without reasonable accommodations before returning to work.

(Slater Aff., Exh. 5 at 5). On July 9, 2003, the plaintiff signed the inter-office communication acknowledging that she had received the document, understood it and agreed to its terms.

In June 2003, the plaintiff was not asking for time off, only approval of future intermittent leave time as necessary. Thereafter, the plaintiff was absent 49.6 days between June 30, 2003, when her leave was approved and her February 24, 2004, retirement for intermittent FMLA leave. The plaintiff was never denied any FMLA time off that she requested.

## EVENTS BETWEEN JUNE AND OCTOBER 2003

On July 10, 2003, defendant Dean sent an e-mail to the plaintiff expressing her displeasure with the way a request for a file was handled by the plaintiff that day. Specifically, an attorney had come to the Treasurer's Office requesting a foreclosure file, but the file could not be located. The plaintiff, who typically handled questions regarding foreclosures and pulled requested files, believed that the file was in defendant Dean's office. Defendant Dean

- 12 -

was out of the office at a morning meeting so the plaintiff asked Mr. Williams how she should

handle the attorney's request because employees were instructed not to go into defendant

Dean's office. Mr. Williams suggested they look in defendant Dean's office so he, the plaintiff

and Faye Schmidt searched for the file in defendant Dean's office. When defendant Dean

returned to the office, she became angry and berated the plaintiff.

Defendant Dean sent an e-mail to the plaintiff bearing the subject line, "Who runs this

office??" and with a cc: to Mr. Williams. (Deposition of Dorothy Dean [Dean Dep.], Exh. 11

at 0087):

> Today I arrived to find an attorney in private practice running the office. He has
> no right to demand that a file be produced instantly for him to review. No one
> who requests any records is to be allowed to look at them alone. They must be
> closely observed by a staff person from this office. So even if the file had been
> found, no customer is ever to look at the file alone. I shudder to think what
> would have happened if my meeting ran longer.
>
> . . .
>
> You are not to use an excuse like "you weren't here". This is unacceptable for
> someone with your experience. You did not phone me. You also know how
> to tell someone that we will call them when we have the file. You are not a
> wimp. You are smart enough and strong enough to handle attorneys – even
> hostile ones like the one today . . . .
>
> You are also never to look at any papers on my desk. NO ONE goes through
> my desk – top drawers, credenza when I am not here. Faye can be consulted
> since she is doing filing.
>
> Pushing matters related to foreclosure off on Richard is not the answer since
> he is not involved in foreclosures as everyone in the office knows. **No one
> phoned me.** Deputy Treasurer is an unpaid position in this county. I have
> never told anyone in this office that Richard would suddenly take on my job. He
> has his own job to do and, as it is important work, he is not to be drawn into any
> situation in the future like the one today. You have the skills to handle it.
>
> As Deputy Treasurer, he is empowered to act in my absence on matters
> requiring a signature immediately. He is empowered to act when I am
> unavailable.

- 13 -

Being "unavailable", means that I am unconscious, unreachable by phone for a period of more than 3 hours, or out of the office, and the state, for more than 3 days. This does not mean, all standards are abandoned because I have a 7:30 am meeting. That is NEVER an excuse for not doing. What happens here when I go to meetings?

I am extremely disappointed at what I found when I arrived this morning . . . .

A repeat of today's situation will result in progressive discipline.

(Dean Dep., Exh. 11) (emphasis in original). When questioned about the e-mail, defendant Dean acknowledged that Mr. Williams suggested that they look for the file in her office. One of the plaintiff's co-workers, Michael Christian, observed the July 10, 2003, incident and describe defendant Dean's conduct as "excessive and out of line." (Affidavit of Michael Christian [Christian Aff.] ¶ 16). Defendant Dean did not reprimand or discipline Ms. Schmidt for her involvement in the incident.

On August 13, 2003, the plaintiff filed a grievance with the Union complaining about the manner in which the defendants had handled her FMLA request in June 2003 and defendant Dean's July 10, 2003, e-mail to her. She also stated in the grievance that her request for confidentiality relative to her FMLA leave request was not honored. The Union did not process the plaintiff's grievance because the plaintiff had retained private counsel.[2] Attorney Slater sent courtesy copies of the August 2003 grievance filed by the plaintiff to Ms. Grimes and Charles E. McDowell, the County's Human Resource Director.

On September 18, 2003, the plaintiff's counsel sent a letter to Ms. Grimes advising her about the plaintiff's grievance, the plaintiff's authorization to file a discrimination complaint and

---

[2] The plaintiff cites the Affidavit of Maurice Pulley, her union steward, in support of her proposed findings of fact on this issue. A review of the court's file and the docket does not show the filing of an affidavit of Mr. Pulley with exhibits.

- 14 -

expressing an interest in resolving the matter short of litigation. The letter sought written assurance that the plaintiff would not be subjected to abusive language from any supervisors and requested payment of attorney fees incurred in obtaining FMLA leave and the resolution of other issues.

Ms. Grimes responded to counsel's letter on October 3, 2003. She stated that based on the knowledge of defendant Dean, the plaintiff had not been subject to written or oral abusive language from any supervisor. The letter further stated that information given to defendant Dean personally and identified as personal and confidential was maintained confidentially and that the July 20, 2003 memorandum was never placed in the plaintiff's personnel file by defendant Dean. Ms. Grimes also advised that the County was denying counsel's request to pay any attorney's fees.

On October 6, 2003, the plaintiff sent an e-mail to Gordon Mueller in the Human Resources Department to get information regarding retirement. She asked Mr. Mueller for information regarding the amount of her retirement benefits were she to retire on her birthday, February 19, 2004, as she would have 15 years of service and would be over age 55. The plaintiff was seeking an approximate monthly benefit figure and confirmation that her heath insurance would be paid.

In a visit with her physician on October 8, 2003, the plaintiff reported that she was possibly going to retire in February 2004. Dr. Zblewski's progress notes for that appointment with the plaintiff state: "Unabating pressure from her boss. [Increased] Zoloft to 75 mg. . . . not as depressed. No teariness or crying spells. Anxiety can still get high at times. Uses Lorazapan 0.5 pm - effective Lorazepan 1.0-1.5 HS pm. - 2x/wk. Appetite okay. No thoughts

- 15 -

of death . . .. Possible retirement in Feb. [at] 90% pension. Continue above meds." (Slater Aff. Exh. 9 at 0009).

On October 29, 2003, the plaintiff again inquired in an e-mail to Mr. Mueller about what her benefits would be if she were to retire on February 19, 2004, and asked if he could set up a time to speak with her financial counselor to provide that person with the numbers and whatever benefits she would have coming to her as of February 2004. (Nett Dep. at 103 and Exh. 45). She wanted to know what her pension would be "if I was not going to get better." (Nett Dep. at 104). The plaintiff looked up the formula in the pension book because that was what Mr. Mueller had told her to do.

## THE ALLEGED RETALIATION AGAINST THE PLAINTIFF BY DEFENDANT DEAN

On September 15, 2003, defendant Dean sent a memo re: "voice mail" to the plaintiff about two personal telephone calls on the plaintiff's voice mail, in addition to other matters. (Nett Dep., Exh. 70 at 0262). The memo stated: Please adhere to the County's technology policy, which allows personal phone calls only in an emergency, and only for a duration of a few (5) minutes." Id. Other employees made personal calls at work. On one occasion, defendant Dean said to Michael Christian, "I know you are on a private call when you're speaking that quietly." (Nett Dep. at 108).

On October 23, 2003, the plaintiff sent a formal written request to Corporation Counsel seeking to review her records with her attorney present. The plaintiff decided to review her personnel records because she "wanted to see exactly what was in there. . .. [She] wanted to make sure that things were not being added to the record that were not – that should not be in there." (Nett Dep. at 62).

- 16 -

On October 24, 2003, defendant Dean issued the plaintiff a verbal warning for making

a personal phone call:

> Helen, On Tuesday, I stopped by your desk at about 3:10 p.m. and waited while you finished a phone call. I heard you making arrangements to meet someone at 6:15 that evening and apologizing for the previous day. It did not sound like a medical emergency nor did it sound like business. Since this office is not open after 5, I am concluding that it was not business related.
>
> Remember the technology policy of Milwaukee County which is very specific about the use of County equipment. The Department Work Rules also cover that topic. This is a verbal warning reminding you of your obligation to follow the technology policy and Department Work Rules related to the use of the telephone.
>
> If I misunderstood let me know or if you have any questions feel free to ask.

(Index of Evidentiary Materials Submitted With the Plaintiff's Memorandum in Opposition to

the Defendant's Motion for Summary Judgment [Plaintiff's Index], Exh. 8 at 0259).

The plaintiff acknowledged that she used the phone for personal use a number of

times during work hours. The plaintiff was issued written warnings about personal phone calls

on October 24, 2003, November 21, 2003, and December 15, 2003. (Dean Dep., Exhs. 16,

17 and 19). The plaintiff stopped making personal calls and made efforts to let callers know

she could not accept personal calls at work.

On November 17, 2003, the plaintiff completed and submitted a "Report and Request

for Time Off" form in order to leave work on November 19, 2003, for a FMLA medical

appointment. Defendant Dean checked the box approving the time off, made some notations

on the form and returned it to the plaintiff. Defendant Dean wrote that the plaintiff needed

to "bring proof of appt." and "need[ed to give] 3 days notice." The plaintiff was confused

- 17 -

about the notations and she and defendant Dean exchanged e-mails. The plaintiff sent her

e-mail on November 20, 2003, and defendant Dean responded the same day. They wrote:[3]

1) Regarding your note to "bring proof of appt.," in my 6/25/03 FMLA Medical Certification by Health Care provider, my physician stated that my next medical appointment would be on 11/19/03. In light of this notation, do you still want proof of the appointment?

*MUST*

*–Yes, we should have supporting documentation of each and every doctor's appointment.*

2) In Regard to your notation that, "need 3 days notice" of future appointments, I understood from the 6/30/03 "Milwaukee County Inter-Office Communication" granting my FML leave, that the county had waived the requirement of advance notice. Did I misunderstand this?

*–I don't know. I will check with Corp. counsel. If you read the time off form carefully, you will see that it asks for 3 days notice whenever possible. The office has to be staffed and if your absence makes it necessary to change lunch schedules or possibly a day off for someone else, I need to know as soon as you know so I can schedule accordingly.*

On November 20, 2003, the plaintiff sent defendant Dean an e-mail requesting a

clearance to accept a telephone call from her physician that day. In an e-mail on November

21, 2003, defendant Dean said that the plaintiff could accept a telephone call from her doctor.

Defendant Dean wrote:

Helen: Clearly from the phone calls I picked up from your voicemail when you were gone and the voicemail was full, you have been accepting personal calls. I very much appreciate your awareness that the telephone is for County business. You can certainly accept a call from a doctor. Brevity is appreciated.

---

[3]Defendant Dean followed the plaintiff's questions with her answers. Defendant Deans responses are in italics to avoid confusion.

- 18 -

(Dean Dep. at 70; Dean Exh. 16). The "veiled threat" involved a remark that the plaintiff stated defendant Dean had made to her about "possibly laying people off." (Nett Dep. at 115).

On January 22, 2003, defendant Dean e-mailed employees in her office a reminder about the County technology policy which "prohibits the use of telephones or e-mails for non-business purposes." (Dean Dep., Exh 18). The e-mail further stated: "There are no exceptions to this policy which extends county-wide." Id.

Following the election of Scott Walker as Milwaukee County Executive in 2003, all department heads were told to consider the reduction of their department staff by thirty-three percent to be effective for the 2004 budget year. On May 13, 2003, defendant Dean sent an e-mail addressed to "Treasurers Office" advising that the County Executive had asked all departments to consider what they would do if 33% of their staffs were cut. (Dean Aff. ¶ 8; Plaintiff's Dep., Exh. 66). Any reference to layoffs in the Treasurer's Office by defendant Dean was meant and intended only to relate to the outstanding issue of the County Executive's desired staff reductions. No one was ever laid off from the Treasurer's Office as a result of the County Executive Walker's sought after staff reductions.

On November 24, 2003, the plaintiff received a call from someone in the City of Wauwatosa with questions about lottery credits. She transferred the call directly to Mr. Williams because he had worked on lottery credits the preceding year. The plaintiff also received a similar call that day from the City of West Allis and transferred that call directly to defendant Dean. An hour later, defendant Dean called the plaintiff into her office and confronted her in Mr. Williams' presence.

- 19 -

The plaintiff alleges that Mr. Williams and defendant Dean unfairly chastised her for forwarding the calls and failing to process lottery credits. Later that afternoon, Mr. Williams called the plaintiff and three of her co-worker's into defendant Dean's office. Defendant Dean said there was a project that "someone" [the plaintiff] should have taken care of a long time ago, and that even though they were all busy, they would have to help her.

During her tenure as Treasurer, defendant Dean was not involved in the processing of lottery credits and had no first hand knowledge regarding the mechanics of what was required to process those credits. It was her understanding that the plaintiff was and always had been the person responsible for processing the credits for first time applicants. On September 19, 2003, the plaintiff sent defendant Dean an e-mail regarding "Letter from State of Wisconsin - Lottery Credit." In this e-mail, the plaintiff wrote:

The letter you placed on my desk from the State of Wisconsin regarding the Lottery Credit File is something that Richard worked on with Mary Malone last year and I am not familiar with the format or how the State wants it, so if its okay with you I will forward the letter to Richard since he was working on it.

Along those same lines I just wanted you to now [sic] that there are lottery credits from 2002 that need to be added to the files and I'm not sure how you would like that handled.

(Slater Aff., Exh. 3 at 0094). Defendant Dean did not respond to this e-mail.

Mr. Williams retired at the end of November 2003. Following his retirement, defendant Dean sent an e-mail, stating that there was no change from the schedules that Mr. Williams had set up for lunches and breaks. The plaintiff understood this e-mail to mean that whenever "Susan" was not in the office, she was to cover the front desk for early break and lunch. Based on this message, the plaintiff went to work at the front desk over the noon hour on December 2, 2003. While she was at the front desk, defendant Dean asked her why she

- 20 -

was at the desk and said that Mr. Christian was to be there. The plaintiff immediately returned to her desk. About an hour later, defendant Dean handed out a "Lunch & Break Schedule" which contained the statement: "If anyone persists in doing it by herself or himself, there will be a warning and then progressive discipline for insubordination." )Dean Dep. Exh. 25).

On December 10, 2003, the plaintiff was ill and saw her physician, Dr. Darren. Dr. Darien advised the plaintiff to take two weeks of medical leave. Before she went to see Dr. Darren, the plaintiff tried to reach defendant Dean by phone to report that she would be absent and taking medical leave. Before Mr. Williams retired, the plaintiff would call him to report her absences, but as of December 1, 2003, defendant Dean was the sole department supervisor. When she could not reach defendant Dean, the plaintiff called Ms. Jackie Bly, the Union president, for advice. Based on that conversation, the plaintiff left defendant Dean a voice message explaining her absence and she also communicated with Ms. Schmidt at the front desk.

The Treasurer's Office work rules state that an employee who is ill and not coming to work must "telephone and talk directly with the Accounting Coordinator or Treasurer within one hour of the time he/she would normally have been scheduled to start working. If management employees are not available, the employee should leave a message on voice mail with the Accounting Coordinator stating their home phone number for management to return the call if necessary." (Nett Dep., Exh. 49 at 0032).

On December 11, 2003, the plaintiff left a message for defendant Dean and left a message at the front desk, stating that she would be absent. About a half hour later,

- 21 -

defendant Dean attempted to reach the plaintiff, but the plaintiff did not answer. She left a

message which stated:

Hi Helen, This is Dorothy, call me back as soon as you get this message. I
cannot authorize a day off with simply a phone call and a voice mail message.
If you take a look at the work rules it requires that you talk to management. I
can't, I really can't treat you any differently than anybody else and I'm sure you
wouldn't want to be treated any differently than anybody else. So call me as
soon as you get this.

(Nett Dep., Exh. 48 at 0183). The plaintiff did not call defendant Dean back that day.

Although the plaintiff was not at work to receive it, defendant Dean also sent her an e-

mail message that day. She wrote:

Helen, please make sure that all your documentation is up to date with notes
from every doctor's appointment and anything else needed to make your file
complete.

This morning you left voice mail before 8 a.m. and called and talked with Susan
at 8:15 am. Susan is not management and the work rules are very clear on the
point that you must talk with management. I called you at 8:25 am and got your
answering machine. I left a message asking you to call me back as soon as
you got the message saying that I am sure you would not want me to treat you
any differently than any other employee. It is now 9:15 a.m. and I have not
heard from you.

It is the County's practice to request and receive documentation from your
doctor that the condition still exists and requires FMLA leave. Again, I do not
need to know the condition but I need to know the limitations it places on your
working for the people of Milwaukee County. A regular review protects
everyone.

(Deposition of Dorothy Dean [Dean Dep.], Exh. 27 at 0254).

Defendant Dean also sent an office-wide e-mail in which she wrote:

I think its just a little past morning. Helen left a voice mail saying that she is not
coming in. Remember than (sic) when you call in, you must speak to
management directly and it is a very good idea to let the front desk know you
will not be in.

(Dean Dep., Exh. 30 at 0112).

- 22 -

The Treasurer's Office routinely required employees to provide proof of all doctor's appointments, as provided in the provisions of the collective bargaining agreement between the Union and the County that covered the plaintiff's employment. The plaintiff had no problem with the work rule that required employees to provide proof of doctor's appointments.

On the morning of December 12, 2003, the plaintiff called defendant Dean to report that she was sick and unable to work. When she could not reach defendant Dean she left a voice mail message. Defendant Dean returned the plaintiff's call at 8:09 a.m., but the plaintiff did not answer. Defendant Dean left a message, stating:

Helen, this is Dorothy, It is about nine minutes after eight, your phone call and voice mail is not sufficient, you must call me back before 9:00 A.M., assuming you are home and if you are ill, I'm sure your home. If you have any questions refer to the department work rules. Unfortunately as much as I hate to but I'm going to have to give you, well I'm going to talk to Mary Ann Grimes about it, but I think a verbal reprimand is warranted for yesterday.

(Nett Dep., Exh. 48 at 0183). Later in the day on December 12, 2003, Attorney Slater wrote a letter to Attorney Grimes, recounting the events of December 10-12, 2003. She concluded by stating:

Based upon her doctor's recommendation, Ms. Nett will be taking two weeks of FML leave. Unless I hear from you to the contrary, Ms. Nett will not be calling in on a daily basis. Please let me know whether Ms. Dean's June 30, 2003 approval will cover this leave or whether it will be necessary for Ms. Nett to provide an additional communication from her physician.

(Dean Dep., Exh. 26 at 0102-0103).

Ms. Grimes was not able to speak with defendant Dean about the plaintiff's counsel's letter of December 12, 2003, until the afternoon of December 16, 2003. Based upon her counsel's letter to Ms. Grimes, the plaintiff did not call in to report her absences of December 15 or 16, 2003.

- 23 -

After speaking with defendant Dean later in the day on December 16, 2003, Ms.

Grimes responded to Ms. Slater by letter, stating that the plaintiff would need to submit a

medical certification for her two week medical leave request. She further indicated that the

plaintiff was facing disciplinary action for her failure to call in her absence and failure to return

defendant Dean's telephone calls. Specifically, Ms. Grimes wrote:

> Ms. Nett's supervisor is Dorothy Dean, Milwaukee County Treasurer. The most current FMLA Certification by Health Care Provider form signed by Ms. Nett and her health care provider that the county received is dated June 25, 2003. The likely duration and frequency of episodes of incapacity section of the form reads *"Frequency may be 1 to 2 times per month with a 1-2 day incapacity."* Under 29 CFR sec. 825.308, an employer may request a recertification because the duration and frequency of an employee's absences have changed significantly.
>
> I am not the supervisor of Ms. Nett. I think it is inappropriate for you to send me a letter detailing who called whom when and what the call-in "practice" is when an employee is absent and whether or not an employee should respond to a request from a supervisor to return a telephone call. The work rule in the Treasurer's office regarding the call-in procedure is attached to this letter. Ms. Nett and all other employees in the Treasurer's office should follow the work rule.
>
> I am authorized by Dorothy Dean to inform you that due to the fact that the duration and frequency of Ms. Nett's absences have changed significantly, pursuant to county policy, she should provide an updated FMLA Certification within 15 days of today's date, not to me but to her supervisor. Please be advised that Dorothy Dean may request a second medical opinion regarding Ms. Nett.
>
> I am further authorized to inform you that Ms. Nett is facing disciplinary action for failure to call in her absence to her supervisor and for failing to return her supervisor's telephone call. Your statement that Ms. Nett will not be calling in on a daily basis does not comport with the work rule regarding attendance. Any questions regarding Ms. Nett's use of FMLA time and related matters should be addressed to Ms. Dean.

(Dean Dep., Exh. 26 at 0104). The plaintiff was not issued any formal discipline for any of

these events.

- 24 -

page 25 & 26
NOT AVAILABLE

PRIVACY
REQUIREMENT

UNDER

E-GOVERNMENT ACT

Dean that she would not return to work until January 5, 2004, unless she felt better before that

date. The plaintiff was granted the time off that she sought.

There were no other phone calls between the plaintiff and defendant Dean during the

period of December 11 to December 19, 2003. On December 23, 2003, defendant Dean sent

the plaintiff a letter which stated:

> Here is a copy of your most recent time sheet as you requested.
>
> When we spoke yesterday I briefly tried to explain the situation with your various types of leave and time off. However, without the papers in front of me I could not give you specifics. As you may recall I had to ask you for 4 time periods (8 weeks) of department time sheets that were not in the black binder. You said you needed them to check for errors. I have talked with payroll and find no reason for the time sheets to be held for more than 2-3 days.
>
> You provided the 8 weeks of time sheets when I asked for them. From now on I expect you to provide the time sheets as soon as you are done reviewing the error report which should take no more than 2 days. Once I had the time sheets to review I looked at everyone's use of time and found that during the 24th pay period, your use of FML, time had exceeded 80 hours for the calendar year.
>
> At the time I discovered this I waited to talk with you about it when you came back to work. However, when I heard nothing, I talked with payroll and they gave me instructions on how to allocate the hours in excess of 80. You can choose to use sick time to cover FML time in excess of 80 hours in a calendar year.
>
> I cannot choose for you to use any sick time that you have remaining. However, I can decide to apply any remaining vacation time, personal time or holiday time. Since you were not here and unreachable, (not returning my call of the 11th and not letting me know that you were going to be off for more than a couple days, not wanting to discuss it at the visitation on Thursday where anyone might overhear) I made the decision to use your remaining vacation time and personal time to cover as many of the hours over 80 as possible.
>
> In pay period 24, 24 hours of vacation time was used to cover 24 hours of FML time. You will be getting a check for those 24 hours. As I understand it, the payment will be with the last payroll this year, which is December 31, 2003.

- 27 -

In pay period 25, 3.6 hours of personal time was used to cover 3.6 hours of FML time. You will be getting a check for those hours too in the last payroll of this year. You have no time remaining to cover the unpaid FML time except sick leave and you alone can make that decision. It is my understanding that today is the last day on which that kind of change can be made to the time sheets - possibly for this year or possibly in order to get you a check in a timely manner.

Then as I discussed with you yesterday, everything starts over again on January 1, 2004 even if that is in the middle of a pay period. What matters is the calendar year. The first 80 hours of FML time starts over again on January 1, 2004.

In the future it would be more helpful if you follow the union contract and departmental work rules. It is the employee's responsibility to contact his/her supervisor as soon as he/she knows that he/she will be off and for how long that is likely to be. It would be helpful if you let me know as soon as you know that you are going to be off for more than 2 days. I did not find out until the following week that you had a different doctor giving different information about limits on your ability to work.

All I had was the information I received last summer and that is the documentation I had to work with. That doctor said you would be absent 1-2 days once or twice a month. You said the new doctor told you that you could return to work on the 26th and the 5th. I pointed out that there is a week's difference between the 26th and the 5th. You quickly said that you would return the 5th. I do not understand how you could know on the 22nd of December that you would need to be off work until the 5th. Perhaps you can explain so that there is no confusion in the future. By January 5 you will have been off work for 18 workdays or a total of 26 continuous days. This does not coincide with the information I have from the new doctor.

Please re-read the Department Work Rules, Section 2 for the procedure for call-in. You will see that no where does it say that an employee must call in repeatedly on the same day. In case of the absence of the Accounting Coordinator, it is sensible to call the Treasurer. I know that is the very procedure I recommended to you when I saw you at the visitation on Thursday. You called on Thursday but did not return my phone call. I wanted to talk with you about how long you planned to be off work. You also told me at the visitation that you would not be in on Friday. You made no mention of taking off the entire following weeks. It would be helpful for everyone in the office to know what time you plan to take off. No one likes last minute changes to their schedule necessitated by a co-worker's sudden change whether it's for a broken leg or anything else.

- 28 -

> Please check your doctor appointment verifications for those days prior to December 10 when you had a doctor's appointment. Make sure that you have one for every occurrence. I think one might be missing.

(Dean Dep., Exh. 32 at 0063-0064 [emphasis in original]).

During that period, defendant Dean or others from the office called the plaintiff on a few occasions while she was home on leave to ask her work-related questions. All employees who were off of work during normal work hours were expected to be reasonably available to take job-related questions where the same proved necessary in management's opinion. To that end, the Treasurer's Office asked all employees to ensure that their personal contact information was up to date so that employees could be reached regarding work related matters in the event such was needed during employees' time off.

This was especially necessary for a number of reasons during the time that the plaintiff was off. Mr. Williams had just retired in late November 2003 and had not been replaced. Defendant Dean was attempting to do her job, Mr. Williams job, and to find ways to get the plaintiff's job done, much of which she and others did not know how to perform. It was also the end of the year, which brought with it many additional duties for defendant Dean.

Given the plaintiff's absences in 2003, her right to substitute paid leave under state FMLA, the County's right to substitute paid leave under federal FMLA, and the plaintiff's insistence that all communication go through her attorney, defendant Dean found it difficult to determine if the plaintiff's time for FMLA leave should be paid or unpaid. Defendant Dean had to consult with Ms. Grimes or the payroll department to make the appropriate payroll code determinations. The plaintiff eventually received all of the pay that she was entitled to for the period of December 21, 2003, to January 3, 2004.

- 29 -

page 30
NOT AVAILABLE

PRIVACY
REQUIREMENT

UNDER

E-GOVERNMENT ACT

## THE PLAINTIFF'S RETIREMENT

The plaintiff's last day worked in the office prior to her retirement was December 9, 2003. The plaintiff claims that she made the decision to retire in January 2004 because the way she was being treated caused her undue stress. The plaintiff reported to her physician on December 23, 2003, that she "[t]ook a 2 week LOA for PCP - feels she was harassed by her boss through that time. Plans on early retirement in Feb. Feels she cannot return to work there." (Affidavit of Lisa Bergerson [Bergerson Aff.] ¶ 3, Exh. A at 0010; Slater Aff., Exh. 9 at 0010).

The plaintiff reported to her physician during a visit on February 3, 2004, that she was feeling better since January 13, 2004, when her boss quit harassing her. The plaintiff retired from her employment effective February 24, 2004.

## MILWAUKEE COUNTY'S FMLA POLICIES

The plaintiff was aware of the provisions of the FMLA during the term of her employment. FMLA information and related forms could be obtained on the County's internet site at www.mcdhr.org in the employment policies section, or they were also available from defendant Dean, Mr. Williams, or the Human Resources Department. FMLA posters were located in the employee break room of the Treasurer's Office.

The County's FMLA policy states that the County "will not . . . use the taking of FMLA leave as a reason to take any adverse employment action against an employee who took FMLA leave." (Slater Aff., Exh. 6, "Milwaukee County Family and Medical Leave Guidelines" at 6). The Employment Policies of Milwaukee County, of which the FMLA is a part, provide that its Division of Human Resources will "respond to and investigate complaints of

- 31 -

discrimination from County employees." (Affidavit of Mary Ann Grimes [Grimes Aff.] ¶ 4, Exh. A "Employment Policies" at 1).

## ANALYSIS

In her complaint, the plaintiff alleges that "the defendants retaliated against [her] and harassed [her] for taking medical leave" under the FMLA. (Complaint ¶ 83). She also asserts that the defendants discriminated against her after she filed a grievance under the FMLA with her Union based on defendant Dean's actions against her for taking leave under the FMLA. Id. ¶ 79. She alleges that the defendants' conduct in this regard amounted to constructive discharge. Id. ¶ 80. Finally, the plaintiff asserts that the "defendants violated 29 C.F.R. § 825.307 when they repeatedly required [her], at her own cost and expense, to meet with her physicians to obtain new medical certifications." Id. ¶ 74.

The FMLA establishes two categories of "broad protection" for employees. King v. Preferred Technical Group, 166 F.3d 887, 892 (7th Cir. 1999). "First, the FMLA contains prescriptive protections that are expressed as substantive statutory rights. The Act provides eligible employees of a covered employer the right to take unpaid leave for a period of up to 12 work weeks in any 12-month period for a serious health condition as defined by the Act. 29 U.S.C. § 2612(a)(1). After the period of qualified leave expires, the employee is entitled to be reinstated to the former position or an equivalent one with the same benefits and terms of employment that existed prior to the exercise of the leave. 29 U.S.C. § 2614(a)." Id. To that end, the FMLA declares it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided." 29 U.S.C. § 2615(a)(1). To prove a deprivation of these substantive guarantees, "the employee must demonstrate by a

- 32 -

preponderance of the evidence only entitlement to the disputed leave." King, 166 F.3d at 891. The intent of the employer is immaterial. Id.

The FMLA also prohibits discrimination against employees for exercising their rights under the Act. See 29 U.S.C. § 2615(a)(1) & (2). "An employer is prohibited from discriminating against employees . . . who have used FMLA leave." 29 C.F.R. § 825.220(c). Specifically, the FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). "Similarly, the Act makes it unlawful for any employer to 'discharge' or 'discriminate' against anyone for taking part in proceedings or inquires under FMLA." Kauffman v. Federal Exp. Corp., 426 F.3d 880, 884 (7th Cir. 2005) (quoting 29 U.S.C. § 2615[b]).

The plaintiff argues that the defendants interfered with her substantive rights under the FMLA when they refused to approve her request for leave once she provided Dr. Zblewski's amended certification. Under the FMLA, eligible employees are entitled to 12 weeks unpaid leave per year for a "serious health condition" rendering the employee unable to perform her job. 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" includes an illness resulting in more than three days of incapacity and requiring treatment at least two times by a health-care provider. 29 U.S.C. § 2611(11); 29 C.F.R. § 825.114(a)(2)(i)(A).

When an employee requests leave for a "serious health condition," the employer may request certification by the employee's health-care provider. 29 U.S.C. § 2613(a). "That certification is sufficient if it provides the date the serious health condition began, its probable duration, relevant medical facts, and a statement that the employee is unable to work." Kauffman, 426 F.3d at 886 (citing 29 U.S.C. § 2613[b]). Under the regulations, if the

- 33 -

employer "finds a certification incomplete," it must "provide the employee a reasonable opportunity to cure any such deficiency." 29 C.F.R. § 825.305(d). Additionally, "[a]n employer that doubts the sufficiency or veracity of the certification may require another opinion." Diaz v. Fort Wayne Foundry Corp., 131 F.3d 711, 713 (7th Cir. 1997).

Section 2613(c) of Title 29 of the United States Code provides:

(1) In general, in any case in which the employer has reason to doubt the validity of the certification provided under subsection (a) for leave under subparagraph (C) or (D) of section 102(a)(1) [29 USCS § 2612(a)(1)(C) or (D)], the employer may require, at the expense of the employer, that the eligible employee obtain the opinion of a second health care provider designated or approved by the employer concerning any information certified under subsection (b) for such leave.

(2) Limitation. A health care provider designated or approved under paragraph (1) shall not be employed on a regular basis by the employer.

In this case, the defendants assert that the plaintiff's first two medical certifications failed to specify the "likely duration and frequency of episodes of incapacity" for her request for intermittent leave. (Dean Dep., Exh. 4). Thus, the defendants assert that the medical certifications were incomplete and, therefore, this is not a case under 29 C.F.R. § 825.307. Rather, they contend that 29 C.F.R. § 825.305(d) is the applicable regulation. The defendants further assert that when presented with the plaintiff's complete medical certification, they approved the plaintiff's request for intermittent leave.

Alternatively, the defendants assert that any alleged violation of the FMLA did not cause the plaintiff any injury. The plaintiff alleges that she incurred "additional out of pocket expenses for two doctor's visits and related attorneys' fees." (Plaintiff's Memorandum in Opposition to the Defendants' Motion for Summary Judgment [Plaintiff's Opposing Brief] at

- 34 -

36). The defendants assert, however, that the plaintiff has not presented any facts to support this assertion.

Although the plaintiff asserts that she incurred expenses relating to the completion of the medical certification, she presents no evidence to support her claimed expenses. Moreover, the defendants did not doubt the validity of the certification provided. Rather, they determined that it was incomplete. Therefore, 29 C.F.R. § 825.305(d) is the applicable regulation. It provides that "[t]he employer shall advise an employee whenever the employer finds a certification incomplete, and provide the employee a reasonable opportunity to cure any such deficiency." 29 C.F.R. § 825.305(d). The defendants did just that. Upon finding the plaintiff's certification incomplete, they provided her a reasonable opportunity to modify her certification.

Specifically, the undisputed facts establish that at a meeting with the plaintiff and her counsel, Ms. Grimes explained that the wording on Dr. Zblewski's June 9, 2003, medical certification was not specific enough for FMLA purposes and she suggested specific language to be included on the form. Dr. Zblewski added the additional language. Later, the plaintiff left the revised FMLA certification on defendant Dean's office chair. Subsequently, defendant Dean denied the plaintiff's leave request because Dr. Zblewski's amended certification lacked any specification of the frequency and duration of the plaintiff's leave. See 29 U.S.C. §2613(b); Kauffmann, 426 F.3d at 886. When the plaintiff submitted a certification that provided the necessary information, her leave was approved on June 30, 2003.

The plaintiff also contends that she produced evidence in the form of Attorney Phillip J. Miller's affidavit "by which a factfinder could conclude that as amended, Dr. Zblewski's certification contained sufficient information for the County to grant her request for intermittent

- 35 -

leave." (Plaintiff's Opposing Brief at 36). Mr. Miller's affidavit is based in large part on his "understanding" of certain events, such as the June 17, 2003, meeting between the plaintiff and her counsel and defendant Dean and Ms. Grimes. Such information is based on hearsay and is not properly considered in ruling on a motion for summary judgment. Moreover, the plaintiff has presented no evidence to call into question the defendant's factual assertion that the amended certification did not state the probable or expected duration of the intermittent leave as required.

With respect to the plaintiff's discrimination and retaliation claims, the court of appeals for this circuit has stated that a claim of discrimination or retaliation under the FMLA is evaluated the same way that a claim is evaluated under Title VII. Buie v. Quad/Graphics, Inc., 366 F.3d 496, 504 (7th Cir. 2004). Thus, a plaintiff in a discrimination case may prove intentional employment discrimination by using either the "direct method" or the "indirect method." See Rhodes v. Illinois Dept. of Transp., 359 F.3d 498, 504 (7th Cir. 2004). "Evidence which in and of itself suggests that the person or persons with the power to hire, fire, promote and demote the plaintiff were animated by an illegal employment criterion amounts to direct proof of discrimination." Venters v. City of Delphi, 123 F.3d 956, 972 (7th Cir. 1997). The evidence may be direct or circumstantial.    Rhodes, 359 F.3d at 504. However, a proffer of direct evidence must relate to the specific employment decision in question.    Plair v. E.J. Brach & Sons, Inc., 105 F.3d 343, 347 (7th Cir. 1997). When evaluating direct evidence, the court looks at the context in which the statement was made:

Ambiguous statements, suspicious timing, discrimination against other employees, and other pieces of evidence nonconclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff.

- 36 -

Mateu-Anderegg v. School Dist. of Whitefish Bay, 304 F.3d 618, 624 (7th Cir. 2002) (quoting Troupe v. May Dept. Stores Co., 20 F.3d 734, 737 [7th Cir. 1994]).

The indirect method requires that the plaintiff apply the burden-shifting method outlined by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981); see also, Kirk v. Federal Property Management Corp., 22 F.3d 135, 138 (7th Cir. 1994). Initially, the burden is on the plaintiff to establish a prima facie case of discrimination.

To establish a prima facie case of discrimination, the plaintiff must show: 1) that she belongs to a protected group; 2) that she performed the job satisfactorily; 3) that she suffered an adverse employment action; and 4) that the employer treated similarly situated employees outside the protected group more favorably. Maarouf v. Walker Mfg. Co., Div. of Tenneco Automotive, Inc., 210 F.3d 750, 752 (7th Cir. 2000) (citing Stalter v. Wal-Mart Stores, Inc., 195 F.3d 285, 289 [7th Cir. 1999]). If the plaintiff establishes all the elements of a prima facie case, the plaintiff raises an inference of discrimination. See Lenoir v. Roll Coater, Inc., 13 F.3d 1130, 1132 (7th Cir. 1994).

Once the plaintiff establishes a prima facie case, the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for the challenged employment decision. Finally, if the defendant produces a legitimate, nondiscriminatory reason for its employment decision, the burden shifts back to the plaintiff to show that the legitimate, nondiscriminatory reason was pretextual. See Kirk, 22 F.3d at 138. The plaintiff may prove pretext directly by showing that "a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason [for the adverse employment action] is unworthy of credence." Billups v. Methodist Hosp. of Chicago, 922 F.2d 1300, 1303

- 37 -

(7th Cir. 1991) (citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256 [1981]).

Establishing a prima facie case of retaliation is similar to establishing a prima facie case of discrimination. Thus, the plaintiff may establish a prima facie case of retaliation either through the direct method or the indirect method. See Racicot v. Wal-Mart Stores, Inc., 414 F.3d 675, 678 (7th Cir. 2005). Under the direct method, the plaintiff must present direct evidence of: 1) a statutorily protected activity; 2) an adverse action taken by the employer; and 3) a causal connection between the two. Stone v. City of Indianapolis Public Utilities Div., 281 F.3d 640, 644 (7th Cir. 2002).

Under the indirect method, the plaintiff must show that: 1) she engaged in a statutorily protected activity; 2) she performed his job according to her employer's legitimate expectations; 3) despite her satisfactory job performance, she suffered an adverse action from the employer; and 4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. Buie, 366 F.3d at 504; Stone, 281 F.3d at 644.

The plaintiff does not contend that there is direct evidence of discrimination. Thus, she is proceeding under the indirect method of proof.[4]

In this case, the undisputed facts show that the plaintiff belongs to a protected group and overall the plaintiff was performing her job satisfactorily. As previously indicated, to

---

[4]The court notes that although the plaintiff states that "[she] has offered no direct evidence of discrimination", she sets forth and applies the standard for cases in which the plaintiff has direct evidence. (Plaintiff's Opposing Brief at 37). The plaintiff relies on King v. Preferred Technical Group, 166 F.3d 887 (7th Cir. 1999). However, in Buie v. Quad/Graphics, Inc., the court of appeals for this circuit explained that "[a]lthough circuit precedent formerly required a causal link, Stone, which was decided under Circuit Rule 40(e), eliminated that requirement from the prima facie case of retaliation under the indirect method." 366 F.3d at 496 n.3.

- 38 -

establish a prima facie case of discrimination under the FMLA, the plaintiff also must show that she suffered an adverse employment action and that Milwaukee County treated other similarly situated employees outside the protected group more favorably.

In Stone, the court explained that "[t]he question of how much evidence the plaintiff must present to establish a triable issue that the adverse employment action of which he complains was retaliatory is not susceptible of a general answer." Id. at 644. However, the court also stated that "we remind that mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue." Id.

Nevertheless, "[o]nly those acts resulting in adverse employment action are cognizable under [the FMLA]." Oest v. Illinois Dept. of Corrections, 240 F.3d 605, 612 (7th Cir. 2001); see also, Knox v. State of Indiana, 93 F.3d 1327, 1334 (7th Cir 1996); McKenzie v. Illinois Dept. of Transp., 92 F.3d 473, 485-86 (7th Cir. 1996). Although the court of appeals for this circuit has defined adverse employment actions quite broadly, "adverse actions must be materially adverse to be actionable, 'meaning more than a mere inconvenience or an alteration of job responsibilities.'" Oest, 240 F. 3d at 612 (quoting Crady v. Liberty Nat'l. Bank and Trust Co. of Illinois, 993 F.2d 132, 136 [7th Cir. 1993]).

In Oest, the court stated that a "'materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" Id. at 612-613 (quoting Crady, 993 F.2d at 136). However, the court explained that "not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment

actions that 'an . . . employee did not like would form the basis of a discrimination suit.'" Oest, 240 F.3d at 613 (quoting Smart v. Ball State University, 89 F.3d 437, 440-41 [7th Cir. 1996]). In Oest, the court emphasized that because "'adverse actions can come in many shapes and sizes,' it is important to consider the particular factual details of each situation when analyzing whether an adverse action is material." Oest, 240 F.3d at 613 (internal citations omitted).

The plaintiff asserts that she was subject to disciplinary actions and verbal warnings in retaliation for taking actions protected by the FMLA. Specifically, the plaintiff asserts that on July 9, 2003, after she was advised that she was approved for FMLA leave, she signed and returned the inter-office communication acknowledging that she received the document, understood it and agreed to its terms. The next day, defendant Dean issued a "scathing reprimand" (as characterized by the plaintiff) to the plaintiff after the plaintiff and Mr. Williams searched defendant Dean's office for a missing foreclosure file. According to the plaintiff, defendant Dean did not reprimand Ms. Schmidt, one of the other employees involved, or Mr. Williams.

The plaintiff also states that on October 23, 2003, she filed a formal written request to review her personnel file to verify that it did not include defendant Dean's July 10, 2003, reprimand. The next day defendant Dean gave her a verbal warning concerning Milwaukee County's technology policy regarding use of office telephone for personal calls.

The plaintiff further asserts that the sequence of events leading to defendant Dean's November 20, 2003, e-mail evidences retaliation. On November 20, 2003, the plaintiff requested permission from defendant Dean to take a personal call from her physician and defendant Dean responded, "Clearly from the phone calls I picked up from your voicemail when you were gone home and the voicemail was full, you have been accepting personal

- 40 -

calls." (Dean Dep. at 70; Dean Exh. 16). According to the plaintiff, defendant Dean was referring to calls she had picked up from the plaintiff's voice mail on September 16, 2003, and for which defendant Dean had issued a verbal warning to the plaintiff on October 24, 2003. The plaintiff stopped making personal telephone calls at work after she received that verbal warning.

Finally, the plaintiff asserts that a December 12, 2003, telephone conversation between her and defendant Dean while she was on medical leave evidences retaliation. According to the plaintiff, defendant Dean said "you are sick today? We may need to get a second opinion, but I don't have any money," and "I was speaking with the Department of Administration and perhaps we may need to lay someone off from our office." (Plaintiff's Opposing Brief at 25).[5]

The plaintiff contends that because "disciplinary action is expressly encompassed within the FMLA's prohibitions, it constitutes an adverse employment action for purposes of a retaliation claim under the FMLA." (Plaintiff's Opposing Brief at 38). The plaintiff cites no case law in support of her position; rather, she cites 29 C.F.R. § 825.220(c), which provides:

An employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave. For example, if an employee on leave without pay would otherwise be entitled to full benefits (other than health benefits), the same benefits would be required to be provided to an employee on unpaid FMLA leave. By the same token, employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under "no fault" attendance policies.

---

[5]The plaintiff cites her complaint at ¶ 51 and her deposition transcript at 124-129 to support this quotation. The transcript does not contain this quotation. Allegations in a complaint do not constitute evidence that is admissible on a motion for summary judgment. Celotex, 477 U.S. at 324 (A summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56[c], except the mere pleadings themselves.").

- 41 -

Contrary to the plaintiff's argument, the federal regulation only prohibits the employer's use of the taking of FMLA leave as a negative factor in disciplinary actions. It does not identify disciplinary actions as a form of prohibited discrimination under the FMLA. The court of appeals for this circuit has held that claims of retaliation under the FMLA are analyzed in the same manner as retaliation cases under other employment statutes. See Buie, 366 F.3d at 503; But cf. Bachelder v. America West Airlines, 259 F.3d 1112, 1125 (9th Cir. 2001) (holding that because 29 C.F.R. 825.220[c] prohibits the use of FMLA-protected leave as a negative factor in an employment decision, a plaintiff only needs to prove by a preponderance of the evidence that taking FMLA protected leave constitutes a negative factor in the decision to terminate her).

A review of the undisputed relevant facts reveals that the plaintiff has failed to establish that she was subjected to an adverse employment action. None of the plaintiff's complaints led to a loss of pay, demotion, suspension or termination. There is no evidence that the plaintiff lost any benefits or that her duties were significantly diminished. Thus, the plaintiff's complaints do not constitute an adverse employment action. See Haywood v. Lucent Technologies, Inc., 323 F.3d 524, 532 (7th Cir. 2003) ("At minimum, the employee must be able to show a quantitative or qualitative change in the terms or conditions of employment.")

Alternatively, the plaintiff asserts that she has presented evidence of constructive discharge. "Constructive discharge, like actual discharge is a materially adverse employment action." E.E.O.C. v. University of Chicago Hospitals, 276 F.3d 326, 331 (7th Cir. 2002). Constructive discharge occurs when an employee's working conditions are so intolerable that a reasonable person in the employee's position would have been forced to quit. Williams v. Waste Management of Illinois, Inc., 361 F.3d 1021, 1032 (7th Cir. 2004).

- 42 -

When an employee alleges that she resigned because of discriminatory harassment, the employee must demonstrate working conditions "even more egregious than the high standard for hostile work environment." Tutman v. WBBM TV, Inc./CBS, Inc., 209 F.3d 1044, 1050 (7th Cir. 2000). This is because in the ordinary case, an employee is expected to remain employed while seeking redress. Id. Once a plaintiff has shown that she was constructively discharged, she must prove that she was constructively discharged because of her membership in a protected class. University of Chicago Hospitals, 276 F.3d at 332; Vitug v. Multistate Tax Com'n, 88 F.3d 506 (7th Cir. 1996).

The plaintiff contends that she presented evidence demonstrating that her work environment was objectively pervasive or severe.[6] Specifically, the plaintiff asserts that she "offers evidence of several repeated disciplinary measures taken against her between July and December 2004." (Plaintiff's Opposing Brief at 43).

Even if the plaintiff were able to prove that she was constructively discharged because she asked for or took protected FMLA leave or because she took part in proceedings or inquiries under the FMLA,[7] she has not demonstrated working conditions that were so intolerable that a reasonable person in the employee's position would have been forced to quit. See Williams, 361 F.3d at 1032. While the plaintiff's work environment may have been less than pleasant, the instances the plaintiff cites are neither sufficiently severe nor pervasive

---

[6]The plaintiff also asserts that "[f]rom the perspective of a person sharing Nett's particular characteristics – having a chronic, progressive and debilitating condition which is aggravated by high blood pressure, any analysis would conclude that her environment was objectively hostile." (Plaintiff's Opposing Brief at 43-44). However, in determining whether the plaintiff's working environment was objectively hostile or whether a reasonable person in the plaintiff's position would have been forced to quit, the court does not take into consideration the plaintiff's personal characteristics.

[7]For example, one of the instances occurred after the plaintiff requested to review her personnel file. Requesting to review your personnel file is not a protected action under the FMLA.

- 43 -

enough to establish a hostile work environment. See Cerros v. Steel Technologies, Inc., 288 F.3d 1040, 1045 (7th Cir. 2002). Thus, the instances the plaintiff cites do not support her assertion that she was constructively discharged. See Tutman, 209 F.3d at 1050.

Moreover, the plaintiff has not presented any admissible evidence that shows that the defendant treated other employees who were not in the protected class more favorably. The plaintiff asserts that defendant Dean did not reprimand two employees,[8] even though she knew that they made personal calls in violation of Milwaukee County's technology policy. However, for the plaintiff to show that she is similarly situated to two other employees with respect to performance, qualification and conduct, she would have to show that "'the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" Snipes v. Illinois Dept. of Corrections, 291 F.3d 460, 463 (7th Cir. 2002) (quoting Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 [7th Cir. 2000]).

The plaintiff has failed to present evidence to establish that she is similarly situated to the two other employees. Moreover, she has not established that the defendants treated similarly situated employees outside the plaintiff's protected group more favorably. Accordingly, the plaintiff has not established the necessary elements of a prima facie case of discrimination.

---

[8]The plaintiff does not identify the two employees.

The court has construed the relevant undisputed facts in the light most favorable to the plaintiff. Nonetheless, based on those undisputed facts, this court concludes that the plaintiff has failed to establish a prima facie claim of discrimination or retaliation under the FMLA.

In sum, based on the undisputed facts before the court, the plaintiff has not established that she suffered an adverse employment action and that other similarly situated employees outside the protected group were treated more favorably. Accordingly, the plaintiff has failed to establish a prima facie case of retaliation or discrimination based on her taking medical leave under the FMLA. See Buie, 366 F.3d at 504; Maarouf, 210 F.3d at 752; Stalter, 195 F.3d at 289. Accordingly the defendant's motion for summary judgment on the plaintiff's FMLA claims will be granted.

## CONCLUSION

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendant's motion for summary judgment be and hereby is **granted**. (Docket # 42).

**IT IS FURTHER ORDERED** that this action be and hereby is **dismissed**.

**IT IS ALSO ORDERED** that the Clerk of United States District Court shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 25th day of August, 2006.

BY THE COURT:

s/ Patricia J. Gorence
PATRICIA J. GORENCE
United States Magistrate Judge